## DALE COUNTY vs. GUNTER.

[ACTION BY WIDOW TO RECOVER DAMAGES FOR THE KILLING OF HER HUSBAND
BY A PERSON IN AMBUSH, &C., UNDER ACT OF 28TH DECEMBER, 1868, "TO
SUPPRESS MURDER, LYNCHING, ASSAULTS, AND ASSAULTS AND BATTERIES."]

1. *County, claim against; what, not required to be presented to commission-*
*ers court before suit.*—The penalty given against a county by the act
entitled "an act to suppress murder, lynching, assaults, and assaults
and batteries," approved December 28, 1868, is not a claim required to
be presented to the court of county commissioners before suit brought,
but must be recovered by an action in the circuit court of the proper
county, by summons and complaint against the county.

2. *Act giving penalty and providing special way to recover; must be*
*strictly pursued.*—The act having provided a special way by which
such penalty is to be recovered and collected, that way, and no other,
must be pursued for that purpose.

3. *Outlaw; word as used in section 1 of act of 28th December, 1868, de-*
*fined.*—The word "outlaw," as employed in the first section of said
act, is not to be understood in the sense of that term as used in the
English statutes and common law, but is to be understood as referring
to the character of person or persons named in the act entitled "an
act for the suppression of secret organizations of men disguising
themselves for the purpose of committing crimes and outrages," ap-
proved December 26, 1868, and who by said act, while under cover of
such disguise, and while in the act of committing, or threatening, or
attempting to commit, the offenses therein named, are put out of the
protection of the law, and may lawfully be shot or killed by any per-
son.

4. *Same; outlawry can not be pronounced by an act of the legislature.*—
Outlawry, legally speaking, is a judicial proceeding, and no one can be
outlawed but in such a proceeding, and "by due process of law." An
act of the legislature is not "due process of law."

5. *Act of December 28, 1868; the words "in disguise," &c., construed.*—A
person "in ambush, or concealed in the bushes," is not a person in
disguise, within the purview and meaning of the act first above named,
and the assassination or murder of a party by a person so ambushed
or concealed, does not inflict upon the county the penalty given by
the first section of said act, unless said party is so assassinated or
murdered "for past or present party affiliation or political opinion."

APPEAL from the Circuit Court of Dale.
Tried before Hon. J. McCaleb Wiley.

On the 28th of December, 1868, the general assembly of Alabama passed an act entitled, " an act to suppress murder, lynching, assaults, and assaults and batteries." The first, second, third, fourth and seventh sections of the act are as follows :

" SEC. 1. *Be it enacted by the General Assembly of Alabama,* That whenever, in any county of this State, any person shall be assassinated or murdered by any outlaw, or person or persons in disguise, or mob, or for past or present party affiliation or political opinion, the widow or husband of such person so murdered or assassinated, the next of kin of such person, shall be entitled to recover of the county in which such murder or assassination occurred, the sum of five thousand dollars as damages for such murder or assassination, to be distributed among them according to the laws of Alabama, regulating the distribution of the estates of intestate decedents.

" SEC. 2. *Be it further enacted,* That said damages allowed in section one of this act shall be recoverable in the following manner : The claimants shall, after the expiration of six months from the murder or assassination aforesaid, bring an action in the circuit court of the proper county, by summons and complaint against the county, alleging the murder or assassination of such person in said county by an outlaw, or person or persons in disguise, riot or mob, and that it was done at least six months before the commencement of the suit. The subsequent proceedings shall be according to the laws of the State and rules of practice in suits between individuals.

" SEC. 3. *Be it further enacted,* That if the issue shall be found for the claimants, judgment shall be rendered in their favor for five thousand dollars and costs against the county. If found for the county, the costs shall be adjudged against the claimants. When judgment is rendered for the claimants, the court shall enter, with the judgment, an order to the court of county commissioners of said county, notice of which shall be issued by the clerk of the court, and served on the probate judge by the sheriff, commanding said [ court of county commissioners] within

twenty days, to assess on the State tax of said county such a per centum as will realize the amount of said judgment for damages and costs.

" SEC. 4. *Be it further enacted,* That the assessment so made shall be delivered to the tax collector of the county, who shall collect such tax, in the same manner as the State tax is collected, within sixty days.

    \*      \*      \*      \*      \*      \*

" SEC. 7. *Be it further enacted,* That if at any time before the payment of the money recoverable under any section of this act, the offenders shall be apprehended and duly tried, convicted and punished, such conviction and punishment shall operate as satisfaction of the judgment in the particular case. If the offenders herein described shall be apprehended and undergoing trial for the offense about which the suit for damages is brought, the court, or in vacation, the presiding judge of the court, may, on a proper showing, suspend proceedings in the suit for damages until the result of the trial of the apprehended person shall be known."

This act being of force, as well as an act entitled " an act for the suppression of secret organizations of men disguising themselves for the purpose of committing crimes and outrages," approved December 26, 1868, (and which, for a proper understanding of the case, is sufficiently set out in the opinion,) the appellee, the widow of W. T. Gunter, brought suit against the county of Dale on the 28th of February, 1870, to recover the damages given by section one of the act of December 28, 1868, for the murder of her husband.

The first count of the complaint, after averring that plaintiff is the widow of said Gunter, &c., alleges that Gunter was murdered and assassinated in the county of Dale " by one Turner Riley, who was there and then an outlaw," and that the assassination and murder was done more than six months before the commencement of the suit, &c. The second, third, fourth and fifth counts were the same in substance as the first, with the exception that in the second count the murder or assassination was alleged

to have been done by " a person in disguise," and in the third count by " persons in disguise," in the fourth count by " a riot," and in the fifth by " a mob."

The defendant pleaded—

1st. The general issue.

2d. That the claim or demand upon which the suit is brought was not presented to the court of county commissioners of Dale county for allowance, reduction or rejection, before the commencement of the suit.

3d. That the claim or demand upon which the suit is brought has never been presented to the commissioners court for allowance, reduction or rejection.

The plaintiff joined issue on the first plea, and demurred to the second and third plea, specifying, among other grounds, that the court of county commissioners had no authority to levy a tax for the payment of said claim before it was judicially established in the mode prescribed by law; secondly, that the commissioners court had no power to allow said claim before it was judicially established in the manner prescribed by law ; and the court sustained the demurrer.

The case was tried on an agreed statement of facts, which, so far as material to a determination of this cause, are as follows :

"It is admitted that plaintiff is the widow of W. T. Gunter, deceased, who also left five children him surviving ; that he was killed in the county of Dale on the 27th of June, 1869, under the following circumstances : The fence on the back part of the plantation of said W. T. Gunter, deceased, on the 27th of June, 1869, was thrown down and a herd of cattle turned into the plantation. Gunter went into the plantation and drove the cattle out at the point where the fence had been thrown down, and then got over the fence, when some person in ambush, or concealed in the bushes, shot said Gunter with a load of large shot, killing him instantly. The signs of the person and of his concealment at the point where the gun was fired were about twenty steps from where deceased fell. Plaintiff

9

and her daughter heard the gun and saw the smoke of the same at the time when Gunter was shot. Several weeks previous to the killing of Gunter, he and one Turner Riley had a difficulty, in which said Riley shot Gunter and wounded him in the arm, and said Gunter shot at said Riley. Gunter caused Riley to be arrested on a warrant issued by a justice of the peace, and after the arrest said Gunter and Riley settled all matters between them, and Riley was not prosecuted any further; although he was put under bond to answer at the next term of the circuit court the charge of an assault with intent to mur- der said Gunter, and was under bond at the time of the murder. This was the only criminal charge against him in said county. Shortly after this settlement Riley declared he intended to kill said Gunter and one Bar- row. Immediately after the killing of Gunter, a mule was stolen from —— ——, and Riley disappeared. In the fall of 1869 Riley was arrested in Corinth, Missis- sippi, by one Glover and a son-in-law of deceased, on a charge of murdering said Gunter, but when within a few miles of Abbeville he escaped, notwithstanding the efforts of his captors and two other men present. Riley acknowl- edged, while under arrest and manacled, that he had killed Gunter, and said if he was carried back to Dale county and convicted and hung for killing Gunter, he would go to hell and fight Gunter there as long as the devil would allow him to do it. Riley came to Dale county since the late war, as he said from Arkansas, and was and is re- garded as being a very dangerous, reckless and bad man. Shortly after Riley's escape, plaintiff, one Haley and one Glover, published and offered a reward for the apprehen- sion of said Riley, but Riley has never yet been arrested, tried, convicted or punished for the murder of Gunter. Dale county never offered any reward for the apprehen- sion of Riley, nor did said county, or the officers thereof, use any diligence beyond the usual course of law to ap- prehend Riley and have him brought to trial and convicted. More than six months had elapsed from the time of the murder to the bringing of this suit, and no person has

been tried, or convicted and punished for the murder of Gunter.    *    *    *    *    *    *

Sometime after the killing of Gunter, the probate judge and sheriff of Dale county notified the governor of the death of Gunter, and that he was supposed to have been killed by said Riley, and requested the Governor to offer a reward for his apprehension, at the same time sending the governor a description of the person and appearance of Riley. Gunter was a man of violent temper; was a Confederate soldier during the war, and repeatedly said he had never taken any oath of allegiance to the United States government since the war, and never intended to; and in fact he had not done so up to the time of his death.

   *    *    *    *    *    *    *

The demand upon which this suit was brought had never been presented to the commissioners court for allowance, &c.

The court, at the request of the plaintiff, charged the jury that "if they believed from the evidence that plaintiff is the widow of W. T. Gunter, deceased, and that said Gunter was murdered or assassinated in the county of Dale on or about the 27th day of June, 1869, and that more than six months had elapsed from the time of the assassination to the commencement of this suit; and that said murder was perpetrated by a person in disguise, or by one Turner Riley, and that neither said Riley nor any other person has been prosecuted or is undergoing prosecution therefor; and if they further believe the evidence in regard to the character, conduct, and declarations of said Turner Riley, as admitted in evidence, and that said Gunter was murdered or assassinated by said Riley as admitted, then they must find for the plaintiff."

To this charge defendant excepted, and brings the case here by appeal, and now assigns as error—

1st. Sustaining the demurrer to the second and third pleas of defendant.

2d. The charge given to the jury.

D. M. SEALS, for appellant.—The demurrer to the com-

plaint assigned as error ought to have been sustained. Section 909 of the Rev. Code, in relation to the bar of *all claims against counties*, which are not presented to the court of county commissioners for allowance within twelve months· after they *accrue* or become payable, is *mandatory* in its character. That it applies to a case like the one under consideration, there can be no doubt, unless the act of December 28th, 1868, *pro hac vice* repeals this section of the Code, or excepts claims like this from its provisions. It is contended by appellee that said act, by implication, excludes from the operation of section 909 the necessity for the presentation of this claim. The right of Mrs. Gunter to the precise sum of five thousand dollars as damages from Dale county, immediately upon the murder or assassination of her husband, was perfect and complete, unless the county proceeded forthwith to prosecute; and hence, it was a claim against the county, and should have been presented within the time prescribed by law. It is true, that section 2 of this act says that "the claimant *shall*, after the expiration of six months from the murder or assassination, bring an action in the circuit court of the proper county, by summons and complaint against the county. What is the object of the statute in fixing the limitation of six months before the said suit can be brought? We submit that it is to allow the county at least six months within which to make payment before incurring the additional expenses incident to a suit; and if at the end of six months the county shall not have paid the said damages, the complainant may (shall) bring the suit; but, nevertheless, the claim should be presented. Section 3 of the act does not forbid this construction of the law. That section simply provides, that if a judgment shall be rendered against the county upon the suit instituted under the first section as aforesaid, that "the court shall enter with the judgment an order to the court of county commissioners of said county, notice of which shall be issued by the clerk of the court and served upon the probate judge by the sheriff, commanding said court of county commissioners, within twenty days, to assess on the State tax of said county such a per centum as

will realize the amount of said judgment for damages and costs." We insist that there is nothing in section number 3 which expressly or impliedly repeals the provisions of section 909 of the Revised Code, or removes the necessity for the presentation of this claim within twelve months.

The latter section only provides a cumulative remedy, a *mode* by which the *judgment* of the court and costs shall be collected from the county, if the claimant should be compelled to sue. Suppose this act had not provided an express mode and means by which the judgment could be made available to the claimant, would not the county still be liable and compelled to pay the judgment, which could have been rendered under the first section of this act? Without the remedy provided in said section 3, it would have been the duty of the court of county commissioners to have raised the money by taxation of the property of the county; and upon the failure or refusal to do so, *mandamus* by the circuit court would have forced the discharge of said duty. So the presentation of the claim is the duty of the claimant; the allowance of the claim, or the payment of the judgment, is the duty of the commissioners court.

Section 2276 exempts executors and administrators from being sued in their representative capacity for six months after the grant of letters testamentary or of administration. The statutes do not, in express words, make it the duty of said personal representatives to pay the debts of the estate, yet no one will deny their right to pay *before* the expiration of six months, they risking the sufficiency of assets to meet all just demands, &c. Notwithstanding suit may be brought after six months, yet the failure of a claimant to present his demand within the eighteen months makes the plaintiff liable for costs of the suit.

Under section 1396 of the Revised Code, " any person injured in person or property," by a defect in a bridge or causeway erected by contract with the county commissioners, may sue and recover damages of the county, provided no guaranty had been taken, or the period for which the guaranty had been taken, had expired. And yet this court

have held that it was the duty of the claimant to make due presentation of his claim to the court of county commissioners within twelve months of its accrual, or he could not recover.—*Barbour County v. Horn.* A person injured as aforesaid could have presented his claim, and if its allowance was refused, he could have sued immediately thereafter and recovered a judgment at the first term of the circuit court, although the twelve months had not elapsed. Under this section the damages, which may have resulted from the injury received by the defects of bridges and causeways, were not fixed by law, nor was there any mode or means by which said damages could be rendered certain as to the amount, except by proof to some competent court.

In the case now before this court, the statute made the damages a fixed and definite demand, dependent alone upon the existence of these facts, to-wit : That William Gunter had been murdered or assassinated " by an outlaw or person in disguise," within the limits of Dale county, and for which the county had failed to prosecute the offender. The right of a person injured by a defect in a bridge or causeway, was likewise dependent upon the existence of certain facts, viz : That·said bridges or causeways had been erected by contract, and that either no guaranty had been taken by the county, or that the period had expired ; and, further, that the injury to the person or property had resulted from said defects. It is certain that Barbour county had a perfect right at any time, even before suit, through its fiscal agent, the court of county commissioners, to have paid the claim of Horn, or to have tendered him a sufficient sum of money in full satisfaction of the damages, which would have defeated a recovery of the county.

For the protection of counties, the legislature has enacted a *general statute* of limitations, beyond which there is no liability. No special statute can contravene its provisions, except by a clearly expressed intention, or by such a certainly implied intention as leaves no doubt upon the mind of the court. Such is not the case in reference to

the effect of section 3 of the act under review. The doctrine of repeal or exception by implication is not a favorite of the courts. A county is a corporation—an ideal, intangible person, created by law, and acts only by and through certain agents. It does not, can not know of the existence of claims against it, either of the character referred to in section 1396 of the Revised Code, or of those arising under the special statute of December 28th, 1868. It is, therefore, only by the presentation of the claim to the proper officers that the county can know that it is a debtor. For which cause, it is unjust and unreasonable that a county should, by law, be made a debtor, and that very law should not afford the county an opportunity of paying the debt without a suit, which would necessarily subject it to expense and costs. Any other construction of all these statutes, than that maintained by us, does not accord with reason or authority.

The charge given is erroneous.

The whole evidence is set out in the record, in which there is not a particle of proof—neither fact nor circumstance—proving, or tending in the remotest degree to prove that said Gunter came to his death by the hand of a person in disguise. The record discloses that the fatal act was committed " by some person in ambush, or concealed in the bushes," and " the signs of the person and of his concealment at the point where the gun was fired about twenty steps from where deceased fell."

1st. Can " a person in ambush " be held as a " person in disguise?" "Ambush," in its primary meaning, is a military phrase signifying " a private or concealed station, where troops lie in wait to attack their enemy by surprise;" and, secondly, it means " the state of lying concealed for the purpose of attacking by surprise ; a lying in wait."

2d. Can " a person concealed in the bushes" be regarded as " person in disguise ?"

The word concealed has no other signification than that of being "kept close or secret ; hid ; withdrawn from sight; covered ;" and hence, the person was kept close or secret,

hid—withdrawn from sight, or covered, by being "concealed in the bushes."

"In disguise" is an expression importing a meaning entirely dissimilar to, and totally different from, either of the phrases "in ambush" or "concealed in the bushes." The word disguised, when employed as a noun, means "a *counterfeit habit ; a dress intended* to conceal the person who wears it." The attempt to construe the mere *position* of "a person in ambush, or concealed in the bushes," as synonimous with, or similar to, the mere *dress* or *mask* of "a person in disguise," would be a wanton outrage upon good sense and logic. A "person in disguise" is one who is visible to the eye, but who can not be identified, because of the dress or mask in which he appears. A "person in ambush, or concealed in the bushes," is one not visible to the eye, and may not be in disguise. Disguise has reference *solely* to the dress or mask assumed, by which the party can not be recognized when seen. Ambush and concealment have reference *alone* to the *position* in which the person hides himself.

The purpose, in the one instance, is to avoid recognition of his person ; and in the other, to hide his person altogether.

The foregoing criticism is rendered more apt, appropriate and conclusive, when reference is had to the acts of the legislature, in which are found the terms "disguises," "hideous and grotesque masks," of both the men and their horses, which are worn to prevent their recognition.

Under a liberal, not to say a strict construction of this penal statute, is it possible to conclude that said Gunter was killed "by a person in disguise ?" Not even the *shadow* of a difficulty lies in the way of a negative answer to this question.

2. In the second place, was said William T. Gunter killed by an outlaw? In discussing this branch of the subject, the most material question that presents itself for consideration is, what is meant by the term outlaw, contained in the act of the legislature, approved on the 28th day of December, 1868, page 444, entitled "An act to sup-

Dale County v. Gunter.

press murder, lynching and assaults and batteries?" What is the legal definition of outlaw? Before the passage of the statute under which this action was instituted, the *law* attached a definite, fixed and certain signification to the character of persons designated as outlaws. An outlaw was defined, in substance, to be a rebel against the State or community of which he was a member; being in contempt and contumacy in refusing to be amenable *to*, or to abide *by* the justice of that court which had lawful authority to call him before it; subject to divers forfeitures and disabilities, whereby he lost *liberam legem*, and was *out* of the *protection* of the *government.*—Bacon's Abridgement, vol. 7, title "Outlaw," page 326.

While outlawry in civil cases has never been known or practiced in the United States, criminal proceedings for that offense have been repeatedly instituted in, and recognized by, the American courts, even within the last forty or fifty years.

Laws of a somewhat similar character have been passed by the congress of the United States, in respect to that numerous class of citizens who engaged in the late war against said government. All persons obnoxious to these laws were, in a measure, placed beyond the protection of the courts of the country, until they availed themselves of the provision of pardon and amnesty held out to them by the government. The most of these congressional enactments have been acquiesced in for seven or eight years, and have not been declared void for unconstitutionality by the highest judicial tribunal of the land. Nearly all the Southern States, after reconstruction under the laws of congress, imposed disabilities on certain classes of citizens, which deprived them of some rights and privileges. In addition to which, the State of Alabama has enacted two statutes in reference to the offense of the same character as outlawry, and which this court have held not to be in conflict with the organic law of the State.—Acts of 1868, pages 444 and 453; *Gunter v. Dale County,* decided at June term, 1870.

There is nothing in the constitution of this State, or of

the United States, in the way of the recognition of the common law right to outlaw a citizen for crimes against *laws already prescribed*, and for the government to withdraw its protection from those who persistently and contumaciously refuse to yield their allegiance to the government; for, in the language of the opinion of our own supreme court in this very case, "protection and allegiance are reciprocal." At common law the odious character known as outlaw forfeited his right to the protection of the law, by withholding his obedience thereto, and by his acts of rebellion and contumacy. The same principle is recognized under our form of government, and has been asserted, as before seen, by this very court. The very word outlaw readily conveys its own meaning.

The inhibition in the constitution of the United States against the passage of "bills of attainder" and "*ex post facto* laws" is no barrier to the recognition of technical outlawry of the common law in criminal proceedings, when they are made to conform to the rules and practice of the American system of jurisprudence. Nor are the foregoing views obnoxious to the objection urged by the appellee in respect to the constitutional prohibition. "A bill of attainder is a legislative act which inflicts punishment without a judicial trial."—*Cummings v. The State of Missouri*, 4 Wallace, 277. The case of *Dreman v. Stifle*, in same report, shows what legislation is not in the nature of a bill of attainder.—4 Wallace, 595. The difficulty suggested by the appellee is more formidable to him than to the appellant; for it is an obstacle in the way of regarding Riley as an outlaw without a *conviction* of outlawry. He may be *in fact* an outlaw as at common law, still he can not be so regarded *in law* until so declared by a court.

If the offense known as outlawry is to be ascertained by reference to the authorities, before Riley can be considered an outlaw, and before it could be properly alleged in the complaint that he was an outlaw, he should have been so declared by a court of competent jurisdiction. By law, no person can be outlawed without due notice, nor should he be held, regarded or punished as such, "*nisi per legem ter-*

*rœ* ;" or, in the words of our constitution, his rights should be forfeited "by due course of law," before its protection can or will be withdrawn from him.—7 Bac. Abr. pp. 239, 350, (*e*) 353, 354, 358 ; Constitution of Alabama, § 3.

The two acts were passed by the same legislative body ; were under consideration at the same time, and were approved by the governor within two days of each other ; and hence both these statutes may be taken together, in *pari materia*, to ascertain the mind of the law making power. This is the usual and legitimate mode of construing legislative enactments.

Tested by this rule, the laws of Alabama recognize such a *character* as outlaw, and withholds its protection from him. Does the description of Turner Riley's character, as contained in the record, show him to have been an outlaw within the meaning of these statutes ?

The evidence recites, that said Riley was, and is regarded by those who knew him, as being "a very dangerous, reckless and bad man ," that he came from Arkansas ; had had a previous difficulty with said Gunter, in which he had wounded him. and that Gunter at the same time shot at Riley ; that Riley had entered into bond for his appearance at the next term of the circuit court of Dale county, to answer the offense of assault with intent to murder said Gunter, growing out of said difficulty ; that the difficulty had been adjusted between them, and that afterwards, (for a cause not stated,) Riley had threatened to kill said Gunter. Do these characteristics come up to the measure necessary to constitute Riley an outlaw ? It should be borne in mind, that the word outlaw is contained in only *one* of these acts, to-wit, that which gives the right of action under which the appellee recovered in the court below. The first section of the act last named alone uses the word "outlaw." If this act alone reflected the legislative mind upon this subject, it would be clear that the term outlaw could bear no other meaning than that which the common law, of force in this State, attached to it. But when the previous legislation of the State, of a kindred character, is considered in connection with this statute, it will appear that there is

*one* class of persons denounced therein, from whom the protecting ægis of the law is withheld, and who, for *that reason*, can well be denominated outlaws. At the same session of the legislature, and two days prior to the approval of the law "for the suppression of murder," &c., an act was passed "for the suppression of secret organizations of men *disguising* themselves for the purpose of committing crimes and outrages." The preamble defines the object had in view in the enactment of that seemingly harsh measure of preventive justice.

[Here appellant's counsel commented at length on the act of December 26th, 1868, referred to in the opinion, and particularly the second section.]

This section renders it too clear for argument to demonstrate what class of persons this law denounces as outlaws, and defines it to be "persons away from their usual residences, *disguised* by masks, or otherwise, so as not to be easily recognized." Would "a person in ambush or concealed in the bushes" answer this description? "In ambush" conveys but one idea; disguised in ambush conveys not only one, but two ideas—that he was both masked and lying in wait; "concealed in the bushes" likewise conveys but one idea—that of his person being hidden; "disguised in the bushes" would indicate that his person was not concealed, but that his disguise prevented the identification of his person.

In view of the highly penal character of this act, and the duty of the courts to construe it with the utmost strictness, we do not hesitate to affirm that there can not be even the shadow of a pretense that Turner Riley was an outlaw. The most liberal, loose and latitudinarian construction of the statute can not, from the evidence, force the conclusion that he is an outlaw under the statutory enactments of the State. It would be a solecism, a misnomer, an outrage upon language to consider him an outlaw, when the evidence fails to show that he was disguised, and when the only evidence of character adduced showed him to be "a very dangerous, reckless and bad man." The evidence shows that, just before the fatal occurrence, he

had submitted himself in obedience to the laws of the country, whose courts had jurisdiction of him.

The court could not judicially know that the term under discussion had a signification different from that which the law gave to it, and different from that of the standard authorities employed by the people to distinguish the meaning, sense and import of the words of the language which communicated their ideas, thoughts and sentiments. It is, therefore, a legal as well as philological absurdity to call Turner Riley an outlaw.

Again: Suppose it should be asked, if persons in disguise were intended by the statute to embrace the term outlaw, why did it, also, include the very word itself? And what office is left for the word outlaw to perform? We answer, in the first place, it is not at all improbable that the legislature intended its legal and well defined meaning as recognized in the American courts; or we may rationally conclude from the two statutes that the legislative mind regarded any persons as outlaws who threw down the bulwarks of the law, denied their allegiance, defied and overrode the civil authorities, and from whom the law held back its protection, by allowing them to be shot, wounded, or killed with impunity; and that *outlaws* and such characters were regarded as synonimous terms.

In this manner all the words of both statutes can have their due signification, as well as perform their legitimate functions and have an appropriate field for their operation; and then the law can be made to harmonize with itself in all its parts. Any other theory would convict the legislature of ignorance and stupidity.

The charge of the court below in relation to the perpetration of the murder by a person in disguise, was entirely abstract, there being no evidence to support it, and was well calculated to mislead and distract the jury, and therefore erroneous, and was certainly injurious to the appellant. The charge was also erroneous, because it submitted to the jury the decision of a question of law, in instructing them to find a verdict for plaintiff if Gunter was *murdered* or *assassinated* by some person in disguise, or by said Riley.

The charge of the court should have been qualified by explanation of the facts which constitute murder or assassination.   The jury was competent to decide the fact of the killing, which was but one ingredient of murder or assassination.   Without appropriate instructions as to these three distinct ingredients of murder, the jury was not lawfully authorized to find that said Gunter was murdered or assassinated, viz :

1. That William T. Gunter had been deprived of his life.

2. That he was killed unlawfully.

3, That he was killed both unlawfully and with malice, and a statement of what facts constitute malice, or from which it may be inferred.

W. C. OATES, for appellee, argued the case elaborately at bar, but no brief of his argument came into Reporter's hands.

PECK, C. J.—But two questions need be considered in disposing of this case.   First.  Is the cause of action disclosed in the complaint a claim required to be presented to the court of county commissioners, to be allowed or rejected by said court before suit brought?   Second.  Do the facts admitted and agreed upon by the parties prove that the plaintiff's husband, William T. Gunter, was murdered or assassinated by an outlaw, or by a person or persons in disguise, or by a mob, within the purview and meaning of the first section of the act entitled "An act to suppress murder, lynching and assaults and batteries," approved December 28, 1868, Book of Acts, p. 452, a.

First.—Sections 907-8-9 of the Revised Code are as follows : § 907 declares that "the court of county commissioners must, in term time, audit all claims against their respective counties ; and every claim, or such part thereof as is allowed, must be registered in a book kept for that purpose ; and the judge of probate must give the claimant a warrant on the treasury for the amount so allowed."

Section 908 says: "If the claim is rejected, or not allowed in full, the claimant may withdraw the same."   And

section 909 enacts, that " all claims against counties must be presented for allowance within twelve months after the time they accrue or become payable, or the same are barred, unless holden by minors or lunatics, who are allowed twelve months after the removal of such disability."

The interpretation of these sections is, 1st that such claims only are required to be presented to the court of county commissioners as the said court is competent to allow, and when allowed, may be paid out of the funds of the county that may be in, or come to the treasury thereof, · by a warrant of the judge of probate in favor of the claimant on the same ; 2d, that if such a claim, when presented, is rejected, or not allowed in full, the claimant may withdraw the same, and may then proceed to collect such claim in the usual way, by suit against the county ; but 3d, that no suit can be maintained against the county on any such claim, until the same has been presented for allowance, and if not presented within twelve months after the same accrues, or is payable, then such claim is barred, (saving the rights of minors and lunatics,) and ceases to ·be a claim that the county is legally bound either to allow or pay by warrant on the treasury, or in any other way.

If a claim is given against a county by statute, and no mode is prescribed for its payment, then it must be presented for allowance like other claims, and paid out of the county treasury in the usual way, by a warrant of the ·judge of probate. If such claim, when presented, is rejected, or not allowed in full, then it may be collected by suit against the county, as other claims are collected that have been presented and rejected, or allowed only in part. But, on the contrary, if the statute by which the claim is given prescribed the way in which the claim is to be collected, and how the means are to be obtained by which it is to be paid ; then the claim must be enforced and paid in the mode and manner provided, and in no other way.

The claim in this case is peculiar in its character, and is given by the first section of the act above referred to. It enacts that " whenever in any county in this State, any person shall be assassinated or murdered by any outlaw,

or person or persons in disguise, or mob, or for past or present party affiliation or political opinion, the widow or husband of such person so murdered or assassinated, the next of kin of such person, shall be entitled to recover of the county in which such murder or assassination occurred, the sum of five thousand dollars as damages for such murder or assassination, to be distributed among them according to the laws of Alabama regulating the distribution of the estates of intestate decedents."

The second section provides how these damages are to be recovered, to-wit, by an action in the circuit court by summons and complaint, and not by presenting them to the court of county commissioners, as a claim against the county.

The third section declares how the judgment, when recovered, shall be provided for and paid, and says : "When judgment is rendered for the claimants, the court shall enter with the judgment, an order to the court of county commissioners of the county, notice of which shall be issued by the clerk of the court, and served on the probate judge by the sheriff, commanding said court [of county commissioners] within sixty days to assess on the State tax of said county such a per centum as will realize the amount of said judgment for damages and costs." The fourth section enacts that "the assessment so made shall be delivered to the tax assessor of the county, who shall collect the same as the State tax is collected, within sixty days."

Here we see the legislature has provided how these damages shall be recovered, and the way and means by which they are to be paid.

It seems to me, giving the language here used its clear and manifest meaning, that these damages are not to be presented to the commissioners court, but can only be recovered by suit, and when judgment is rendered for the plaintiff, it is not to be paid by a warrant of the judge of probate on the county treasury, nor is it to be collected like ordinary judgments, by execution, but in the mode prescribed by the third and fourth sections of said act. It

is unnecessary to inquire into the purpose or policy of the legislature in prescribing the remedy and means of payment in such cases. The law being plain, it is the duty of parties and the courts to obey it, unless it is in conflict with some fundamental law of the land; but I do not understand any objection of this sort to be made against this statute. To my mind, however, the purpose or policy of this law is by no means obscure. In the first place, the legislature intended the question, whether the assassination or murder was perpetrated by an outlaw, or by a person or persons in disguise, or by a mob, should be inquired into and determined by a jury, and not by the court of county commissioners. It is a question rather of fact than of law, and, therefore, peculiarly proper for the consideration of a jury. Such a trial is required for the security and protection of both parties, the county, as well as the plaintiff. When the fact and character of the assassination or murder is ascertained, the law itself fixes the amount of the damages; it is five thousand dollars, and the jury can find neither more nor less.

In the second place, the manner of payment is obviously intended to operate in the nature of a penalty and punishment upon each individual tax-payer in the county, according to the value of his property, and by this means to bring home to each individual the importance of using his influence to promote a humane and just public sentiment; a public sentiment that will not only discourage and make violence and crime disreputable and disgraceful, but also stimulate every member of the community to be active to ferret out and bring to punishment violators of the laws and disturbers of the peace and good order of society. For these reasons, we hold that the plaintiff's demurrer to the second and third pleas was properly sustained.

2. The second question to be considered is, do the facts admitted and agreed upon prove that the plaintiff's husband was assassinated or murdered by an outlaw, or by a person or persons in disguise, or by a mob, within the purview and meaning of the first section of the said act of the 28th of December, 1868?

The difficulties surrounding this question are, in determining who is an outlaw, within the meaning of this section of said act, and what we are to understand by the phrase there used, "person or persons in disguise." As to the word " mob," no trouble need be taken about it, as it is not claimed that the plaintiff's husband was assassinated or murdered by such an assemblage of persons, or that he was assassinated or murdered for " past or present party affiliation or political opinion."

In examining this question, thus narrowed down, it must not be forgotten that the penalty inflicted by this section on a county is not inflicted for any or every assassination or murder, but only when the assassination or murder is perpetrated by an outlaw, or by a person or persons in disguise.

The word " outlaw," as used in that act, does not mean an " outlaw " in the common law sense of that term. If it does, then I am prepared to hold that there is, and can be, no such outlawry in this State.

By the common law, an outlaw is one who has been so declared by the judgment of a court of justice, in some regular proceeding for that purpose; and this could take place in either a civil or criminal proceeding.—Bl. Com., Wendell's, 3d vol., 283-4, 319; Bacon's Abr. 3d vol., title *Outlawry*, 746. This author says: " Outlawry is a punishment inflicted on a person for a contempt and contumacy, in refusing to be amenable to, and abide by, the justice of that court which hath lawful authority to call him before them; and is a crime of the highest nature, being an act of rebellion against that state or community of which he is a member. So doth it subject the party to divers forfeitures and disabilities; for thereby he loseth *liberam legum*, is out of the king's protection," &c. In a civil case, outlawry puts a man out of the protection of the law, so that he is incapable to bring an action for the redress of injuries; and it is also attended with a forfeiture of all his goods to the king.—3 Bl. Com. 283-4. The punishment for outlawry upon indictment for a misdemeanor, is the same as for outlawry upon civil actions; but outlawry in

treason or felony amounts to a conviction and attainder of the offense charged in the indictment, as much as if the offender had been found guilty by his country.—4 Bl. Com. 320.

Outlawry by the common law, if not inconsistent with the letter of our bill of rights, is so with its spirit. 1. It not only puts a man out of the protection of the law, but also renders him incapable to bring an action for redress of injuries. This is in conflict with the 15th section of the bill of rights, which declares that "all courts shall be open, that any person for any injury done him in his lands, goods, person or reputation, shall have a remedy by due process of law; and right and justice shall be administered without sale, denial or delay." 2. It works forfeiture of goods, and in case of treason or felony, of lands also. This is repugnant to the 21st section of the bill of rights, which says that "no person shall be attainted of treason by the general assembly," and that "no conviction shall work corruption of blood, or forfeiture of estate." If there can be no forfeiture of estate on a conviction for treason, certainly there can not be on conviction for any less offense.

Anciently, an outlawed felon was said to have *caput lupinum*, and might be knocked on the head like a wolf by any one that should meet him; but to avoid such inhumanity, since Bracton's time it has been otherwise, and to kill an outlawed person wantonly is murder.—4 Bl. Com. 320.

By *magna charta* it is ordained that no freeman shall be outlawed, that is, put out of the protection and benefit of the law, but *according to the law of the land.*—1 Bl. Com. 142; 2 Part. Coke's Institutes, 46.

In England there are statutes, and an ancient and well settled practice of the courts, according to which a man may be outlawed; but where, in this country, do we find any statutes or practice of the courts, by which a man in either a civil or criminal case, can be outlawed according to the law of the land? I know of none. The English common law and statutes, on this subject of outlawry, have

never been recognized, or in any wise adopted in this State, and the whole system is inconsistent with our institutions, and repugnant to our constitution and laws, and is without any force among us.

We must, therefore, look somewhere else for the meaning of the word outlaw, as employed in the act of the 28th December, 1868. That is the only statute, so far as I know, in which this word is used, and, if possible, we must find a meaning for it not inconsistent with the constitution. Such a meaning, I think, is found in the act of the 26th of December, 1868, approved only two days before the act last named, and upon a kindred subject, entitled " An act for the suppression of secret organizations of men disguising themselves for the purpose of committing crimes and outrages."—Acts 1868, 444. The preamble to this act recites that " whereas, there is in the possession of this general assembly ample and undoubted evidence of a secret organization, in many parts of this State, of men who, under the cover of masks and other grotesque disguises, armed with knives, revolvers and other deadly weapons, do issue from the place of their rendezvous, in bands of greater or less number, on foot or mounted on horses, in like manner disguised, generally in the late hours of the night, to commit violence and outrages upon peaceable and law abiding citizens, robbing and murdering them upon the highway, and entering their houses, tearing them from their homes and the embrace of their families, and with violent threats and insults inflicting on them the most cruel and inhuman treatment ; and whereas, this organization has become a wide-spread and alarming evil in this commonwealth, disturbing the public peace, ruining the happiness and prosperity of the people, and in many places overriding the civil authorities, defying all law and justice, or evade detection by the darkness of night, and with their hideous costumes," &c. By the second section of this act it is declared that " any person or persons found away from the place of their usual residence, disguised by mask or otherwise, so as not to be easily recognized, who shall commit, or threaten to commit, any assault or assault

and battery, or any violence upon the person of another, or any trespass on the property or premises of another, shall be held guilty of a felony, and his disguise shall be sufficient evidence of his evil intent and of his guilt, and on conviction shall be fined one thousand dollars, and be imprisoned in the penitentiary not less than five years and not more than twenty years, at the discretion of the court trying the same; and any one who may shoot, or in any way kill or wound such person while under the cover of such disguise, and while in the act of committing, or attempting, or otherwise, to commit such violence or trespass, shall not be held guilty, before the law, of any offense against such person, or the State, or be made to suffer any penalty for such act."

Here we have a certain description and character of persons who, when disguised by masks or otherwise so as not to be easily known, commit or threaten to commit certain offenses while so disguised, and it is made lawful for any one to shoot, or in any way to kill or wound them, while in the act of committing, or threatening to commit, such offenses, and the person slaying or wounding them is declared not to be guilty, before the law, of any offense against such person, or the State, or to be made to suffer any penalty for such act. This, in a very untechnical, loose and indeterminate sense, may be said to be a kind of outlawry. By this I do not intend to be understood as holding that any one can be, in any proper and legal sense, outlawed by a legislative enactment; that can only be done in a judicial proceeding, and " by due process of law." An act of the legislature is not " due process of law." Due process of law, means a proceeding " by indictment or presentment of good and lawful men, where such deeds be done, in due manner, or by writ original, of the common law."—2 Institutes, 50; *Dorman v. The State*, 34 Ala. 220–237; *Weaver et al. v. Lapsley*, 43 Ala. 232.

It is in this loose sense we must find the meaning of the word outlaw, as it is employed in the said act of the 28th of December, 1868, otherwise it must be treated as with-

out meaning; and with this meaning it adds nothing, in reality, to the force and effect of the act. It was, no doubt, employed by the legislature without any very definite idea or comprehension of its true meaning, and to add a sort of force and strength to the expression " person or persons in disguise," having reference to the act for the suppression of secret organizations of men disguising themselves for the purpose of committing crimes and outrages. Both these expressions, then, as there used, must be held to mean substantially the same thing; and so it comes to this : does the evidence admitted and agreed upon prove that the plaintiff's husband was assassinated or murdered by a " person or persons in disguise?" This question, after the maturest reflection, I feel constrained to answer in the negative.

The evidence of the plaintiff, as stated and admitted, says the plaintiff's husband was shot by some person in *ambush, or concealed in the bushes.* The noun *ambush* means, 1st, the act of attacking an enemy unexpectedly from a concealed station; 2d, a concealed station, where troops or enemies lie in wait to attack by surprise; an ambuscade; 3d, troops posted in a concealed place, for attacking by surprise. The verb *ambush* means, to lie in wait; to surprise; to place in ambush. *Conceal* means, 1st, to hide, or withdraw from observation; 2d, to withhold from utterance or declaration. The synonims of conceal are, to hide; disguise, dissemble; secrete. To hide, is generic; conceal, is simply not to make known what we wish to secrete; disguise, or dissemble, is to conceal by *assuming some false appearance;* to secrete, is to hide in some place of secresy. A man may conceal facts, disguise his sentiments, dissemble his feelings, or secrete stolen goods. The verb *disguise* means, 1st, to change the *guise or appearance of, especially to conceal by an unusual dress;* to hide by *a counterfeit appearance;* 2d, to affect or change by liquor; to intoxicate. The noun *disguise* means, 1st, *a dress or exterior put on to conceal or deceive;* 2d, artificial language or manner, assumed for deception; 3d, change of manner by drink; slight intoxication. This learning I

derive from Mr. Webster, and I am satisfied with it. I can hardly conceive of things better distinctly marked and different, than that of a person or persons in ambush, or concealed in the bushes, where a person so concealed lies in wait to attack by surprise ; and a person or persons in disguise, or disguised by *an unusual dress*, or, in the language of the preamble to the act, to suppress secret organizations of men disguising themselves for the purpose of committing crimes and outrages, by the use of masks, hideous costumes, and other grotesque disguises. If I were to write a dozen pages on this subject, I should probably not be better understood than I am now, and certainly I should not be more thoroughly convinced myself. My conclusion is, that the written charge of the court, given at the request of the plaintiff, is not sustained by the evidence, and should have been refused.

Let the judgment be reversed and the cause remanded, at the appellee's cost.