**MORGAN et al. v. UNITED STATES.**

**No. 10891.**

Circuit Court of Appeals, Eighth Circuit.

April 12, 1938.

Edward H. Coulter, of El Dorado, Ark., and Kelly Brown, of Muskogee, Okl., for appellants.

Leon B. Catlett, Asst. U. S. Atty., of Little Rock, Ark. (Fred A. Isgrig, U. S. Atty., and Gordon Frierson, Asst. U. S. Atty., both of Little Rock, Ark., on the brief), for the United States.

Before STONE, WOODROUGH, and VAN VALKENBURGH, Circuit Judges.

WOODROUGH, Circuit Judge.

S. R. and M. B. Morgan appeal from a jury verdict and judgment of the United States District Court for the Western Division of the Eastern District of Arkansas holding them guilty of criminal contempt and sentencing them to six months in jail.

The record discloses that the United States District Attorney applied to the District Judge then presiding in said court for direction to file information charging the appellants with criminal contempt of the court sitting in bankruptcy, and the prosecution herein was upon the verified information filed pursuant to the direction given by the court. It accused the appellants of conspiring to obtain and obtaining money belonging to two bankrupt estates in course of administration, by false representations and by deceit practiced upon the trustee and referee in bankruptcy, "in defiance of the authority and dignity and in contempt of said court and the referee."

The several returns made by the appellants admitted the pendency of the bankruptcy proceedings in the court but denied the accusations of wrongdoing. Both of the appellants testified in their own behalf, but there was substantial testimony to support the material allegations of the information which is copied in the footnote.[1]

---

[1] "Comes now Fred A. Isgrig, United States Attorney for the Eastern District of Arkansas, and informs the Court:

"I. Joe H. Schneider is a duly appointed, qualified and acting Referee in Bankruptcy in this Court and was such at all times mentioned in this information.

"II. The Municipal Gas Company, a corporation, and the Cherokee Public Service Company, a corporation, were each and both of them adjudicated voluntary bankrupts by this Court sitting in Bankruptcy on January 8, 1932, and said causes were each and both of them referred generally by this Court to said Joe H. Schneider, said Referee in Bankruptcy, as provided by law.

"III. On February 18, 1932, W. D. Dickinson was duly elected trustee of each and both of said bankrupts and thereafter duly qualified as such trustee and has at all times since said date and at all times hereinafter mentioned in this information been the duly elected, qualified and acting trustee of said bankrupts and as such trustee has been vested with title to all property of said bankrupts, both real and personal, including the moneys on hand and in bank and moneys coming into his hands by reason of said trusteeship in bankruptcy.

"IV. On August 15, 1935, and at all times hereinafter mentioned in this information, the said W. D. Dickinson, trustee as aforesaid, had in his possession as such trustee moneys in bank belonging to said bankrupt estates exceeding the sum of $10,000.00. Said moneys, together with other moneys, belonging to said bankrupt estates, were on deposit in the First National Bank at Wagoner, Oklahoma, a duly designated depository.

"V. Prior to bankruptcy both S. R. Morgan and M. B. Morgan were intimately connected with the management and control of the Municipal Gas Company and the Cherokee Public Service Company, Bankrupts, and the said M. B. Morgan claimed the ownership of both of said bankrupts through the ownership of all the stock of the Morgan Utilities, Incorporated, Bankrupt.

"Shortly after the election of said W. D. Dickinson as trustee as aforesaid, the defendant, M. B. Morgan, was employed by him as general manager to operate and manage the properties of said bankrupts and to assist and advise generally in the conduct and the winding up of the affairs of said bankrupt estates. The duties of said M. B. Morgan, among other things, consisted of aiding said trustee in procuring a supply of gas for said bankrupts for distribution in the City of Muskogee, Oklahoma.

"The defendants, S. R. Morgan and M. B. Morgan, named in the caption of this information, are brothers. Each and both of said defendants knew at the time of the matters and things herein charged that the Cherokee Public Service Company, a corporation, and the Municipal Gas Company, a corporation, had been adjudged bankrupts on January 8, 1932, and were in process of liquidation and well knew that Joe H. Schneider was the Referee in Bankruptcy of this Court as herein alleged and that W. D. Dickinson was trustee of said bankrupt estates as herein alleged and well knew that the moneys procured from said trustee as hereinafter set forth were assets of said bankrupt estates and in the custody of this Court at all times, when said moneys were fraudulently procured as hereinafter charged.

"VI. On or about September 1, 1935, the said M. B. Morgan and his brother, S. R. Morgan, planned, connived and confederated together to unlawfully and wrongfully procure, and they did thereafter procure, from said bankrupt estates and from said W. D. Dickinson as trustee thereof, a large sum of money, to-wit, $10,000.00, then and there in the possession of said Court, in defiance of the authority and dignity and in contempt of said Court and the officers of said Court, namely, the said Joe H. Schneider, Referee in Bankruptcy, and the said W. D. Dickinson, trustee of said bankrupt estates, in the following manner, to-wit:

"On or about August 15, 1935, W. D. Dickinson, trustee as aforesaid, authorized and directed said M. B. Morgan to en-

■ The appellants contended before the trial court, and now to this court, that the facts set forth in the information do not present a contempt of the authority

ter into negotiations and consummate a contract on said trustee's behalf with the Pure Oil Company upon the terms and conditions set out in the contract below, in order to secure a supply of gas with which to meet the needs of the Municipal Gas Company and the Cherokee Public Service Company, Bankrupts, for distribution in the City of Muskogee, Oklahoma. Accordingly, thereafter M. B. Morgan, acting for said W. D. Dickinson, trustee aforesaid, negotiated said contract with said Pure Oil Company, which was reduced to writing by said Pure Oil Company and made ready for execution by said W. D. Dickinson, trustee for Municipal Gas Company, Bankrupt. Said contract was in terms and figures as follows, to-wit:

(The contract here set out is in thirteen numbered paragraphs and covers four printed pages. By its terms the Pure Oil Company, as seller, agrees with W. D. Dickinson, trustee for Municipal Gas Company, Bankrupt, as buyer, upon terms and conditions for the sale and delivery to the buyer's distribution system of a certain volume of refinery gas. Blanks are left for the signatures of the Pure Oil Company, By ———— Vice-President, and ———— W. D. Dickinson, trustee for Municipal Gas Co., Bankrupt.)

"VII. M. B. Morgan, with full knowledge of the intent and purpose of W. D. Dickinson, trustee, to contract with said Pure Oil Company upon the terms and conditions set out in the contract quoted in paragraph VI above, concealed from said W. D. Dickinson, trustee aforesaid, the fact that said contract had been consummated with said Pure Oil Company and was ready for execution by said W. D. Dickinson, trustee; on the contrary, said M. B. Morgan advised and represented to W. D. Dickinson, trustee aforesaid, that he had not been able to consummate said contract with said Pure Oil Company and that said Pure Oil Company was insisting upon a contract different and more advantageous in its terms to said Pure Oil Company.

"Shortly after the consummation of the contract set out in paragraph VI above, but at a time when W. D. Dickinson, trustee, was without knowledge that said contract had been so consummated, S. R. Morgan, brother of M. B. Morgan, went to Chicago, Illinois, to the home office of said Pure Oil Company and without the knowledge or consent of said W. D. Dickinson, trustee, represented to said Pure Oil Company that said W. D. Dickinson,

trustee, would organize or had organized an Oklahoma corporation under the name and style of Oklahoma Petroleum Products Company for the purpose of creating a separate entity to enter into the contemplated contract with said Pure Oil Company; and the said M. B. Morgan and S. R. Morgan, acting together and without the knowledge and consent of the said W. D. Dickinson, trustee, but with full knowledge of the intent and motives one of the other, connived and confederated to induce and did induce the said Pure Oil Company to alter and amend the contract contemplated to be executed between the said W. D. Dickinson, trustee, and the said Pure Oil Company, which had already been drafted, as set out in paragraph VI of this information, by changing the name of said W. D. Dickinson, trustee for Municipal Gas Company, Bankrupt, therein, and substituting therefor the name of the Oklahoma Petroleum Products Company. Said contract so changed and executed by and between said Pure Oil Company and said Oklahoma Petroleum Products Company was in words and figures as follows:

(The contract here set out is word for word the same as the one above described, except that it is between and is signed by the Pure Oil Company, as seller, and the Oklahoma Petroleum Products Company, as buyer.)

"VIII. On or about October 12, 1935, M. B. Morgan and S. R. Morgan wrongfully and unlawfully confederated together and acting through the said M. B. Morgan, and by misrepresentation and fraud induced W. D. Dickinson, trustee for the Municipal Gas Company, Bankrupt, to execute a contract with the Oklahoma Petroleum Products Company, which the said M. B. Morgan falsely represented was then in existence and was a trade name for or a subsidiary of said Pure Oil Company, and the said M. B. Morgan willfully, wrongfully and fraudulently informed and gave said W. D. Dickinson, trustee for the Municipal Gas Company, Bankrupt, to understand that said contract was the result of the negotiations conducted by him on behalf of said W. D. Dickinson, trustee for said Municipal Gas Company, Bankrupt, with the Pure Oil Company, acting under the trade name or through said subsidiary called Oklahoma Petroleum Products Company. Accordingly, on October 12, 1935, the said W. D. Dickinson, as trustee for said Municipal Gas Company, Bankrupt, relying upon the advice and information given to him by said M. B.

Morgan, signed said alleged contract with the said purported corporation called Oklahoma Petroleum Products Company. Said contract in words and figures is as follows, to-wit:

(The contract here set out is between and signed by the Oklahoma Petroleum Products Company, as seller, and W. D. Dickinson, trustee for the Municipal Gas Company, Bankrupt, as buyer of refinery gas and the differences between its provisions and those of the above described contracts are specified in the information.)

"IX. At the date of the signing of said contracts as set out in paragraphs VII and VIII of this information, the said Oklahoma Petroleum Products Company had not been organized as a corporation and there was in fact no such corporation in existence. Subsequently, however, to-wit, on October 24, 1935, the said M. B. Morgan and S. R. Morgan, acting together, wrongfully, unlawfully, and fraudulently procured the organization of said Oklahoma Petroleum Products Company as an Oklahoma corporation. The organization of said Oklahoma Petroleum Products Company was effected through dummy organizers who pretended to subscribe for stock, acting as organizers, stockholders and officers of said corporation, but who in fact paid nothing for the stock for which they subscribed. Said corporation was never legally organized and was without legal existence, although the dummy organizers appearing on the face of the corporation papers represented that said corporation had a paid-up capital stock of $5,000.00. The attempted organization of said corporation was in furtherance of the fraudulent scheme of said S. R. Morgan and M. B. Morgan, confederating and acting together and utilizing said dummy organizers, to create a fictitious corporation for the purpose of permitting them on their own behalf to procure the advantageous contract with the Pure Oil Company set out in paragraph VII hereof, and on the other hand to mislead and deceive said W. D. Dickinson, trustee of the Municipal Gas Company, Bankrupt, and to induce him to execute said fraudulent contract set out above in paragraph VIII of this information under the belief that he was in fact contracting with the Pure Oil Company. Said fictitious and fraudulent corporation so organized was in truth and in fact S. R. Morgan and M. B. Morgan acting under said fictitious name and was but a subterfuge employed by said S. R. Morgan and M. B. Morgan to hide their identities and permit them to contract with the said W. D. Dickinson, trustee for the Municipal Gas Company, Bank-

rupt, and thereby wrongfully, unlawfully, and fraudulently procure the sum of $10,-000.00 from said W. D. Dickinson, trustee, for their own use and benefit, to-wit, the use and benefit of the said S. R. Morgan and M. B. Morgan, which was done in the following manner and on the following dates, to-wit:

"(1) Although in the contract between said Pure Oil Company and the fictitious corporation styled Oklahoma Petroleum Products Company dated October 12, 1935, it was covenanted that the Pure Oil Company would at its own expense construct a gas line from its plant to the distributing system of the Municipal Gas Company, the said S. R. Morgan and M. B. Morgan, acting through said fictitious corporation, Oklahoma Petroleum Products Company, exacted from said W. D. Dickinson, trustee for the Municipal Gas Company, Bankrupt, under the contract dated October 12, 1935, executed by W. D. Dickinson, trustee, with said Oklahoma Petroleum Products Company, a covenant to pay one-half of said construction cost. Accordingly, on or about September 14, 1935, in anticipation of the provisions of the contract subsequently executed between the said fictitious corporation, Oklahoma Petroleum Products Company, and W. D. Dickinson, trustee for the Municipal Gas Company, Bankrupt, said M. B. Morgan and S. R. Morgan, acting together, procured from said W. D. Dickinson, trustee, the sum of $2,500.00, which sum was by S. R. Morgan and M. B. Morgan converted to their own use and benefit.

"(2) Although in the contract between said Pure Oil Company and the fictitious corporation styled Oklahoma Petroleum Products Company there was no covenant for a cash deposit to insure the payment for gas used, the said S. R. Morgan and M. B. Morgan, acting through the fictitious corporation, Oklahoma Petroleum Products Company and under its fraudulent contract with W. D. Dickinson, trustee aforesaid, exacted from the said W. D. Dickinson, trustee for the Municipal Gas Company, Bankrupt, a covenant to pay the sum of $2,000.00 cash as a guarantee for prompt payment of gas which the said fictitious corporation purported to sell to said W. D. Dickinson. Accordingly, on or about October 24, 1935, in pursuance of said fictitious and fraudulent contract, said S. R. Morgan and M. B. Morgan procured the sum of $2,000.00 from said W. D. Dickinson, trustee for Municipal Gas Company, Bankrupt, and converted said moneys to their own use and benefit.

"(3) Although in the contract between the Pure Oil Company and the fictitious

of the court which the court was empowered to try by jury or to punish by imprisonment. They insist that the act of 1831, now 28 U.S.C.A. § 385[2], is the law which specifies the cases in which such punishment for contempt may be imposed by the United States District Courts and that the acts charged against them are not within the terms of that law. The act was expounded by the Supreme Court in Ex parte Robinson, 19 Wall. 505, 510, 86 U.S. 505, 22 L.Ed. 205, as follows: "The power to punish for contempts is inherent in all courts; its existence is essential to the preservation of order in judicial proceedings, and to the enforcement of the judgments, orders, and writs of the courts, and consequently to the due administration of justice. The moment the courts of the United States were called into existence and invested with jurisdiction over any subject, they became possessed of this power. But the power has been limited and defined by the Act of Congress of March 2d, 1831. The act, in terms, applies to all courts; whether it can be held to limit the authority of the Supreme Court, which derives its existence and powers from the Constitution, may perhaps be a matter of doubt. But that it applies to the Circuit and District Courts, there can be no question. These courts were created by act of Congress. Their powers and duties depend upon the act calling them into existence, or subsequent acts extending or limiting their jurisdiction. The act of 1831 is, therefore, to them the law specifying the cases in which summary punishment for contempts may be inflicted. It limits the power of these courts in this respect to three classes of cases: 1st, where there has been misbehavior of a person in the presence of the courts, or so near thereto as to obstruct the administration of justice; 2d, where there has been misbehavior of any officer of the courts in his official transactions; and, 3d, where there has been disobedience or resistance by any officer, party, juror, witness, or other person, to any lawful writ, process, order, rule, decree, or command of the courts. As thus seen the power of these courts in the punishments of contempts can only be exercised to insure or-

corporation styled Oklahoma Petroleum Products Company there was no covenant for payment of a minimum amount per month when no gas was purchased or consumed, the said S. R. Morgan and M. B. Morgan, acting together through the fictitious corporation, Oklahoma Petroleum Products Company, exacted from the said W. D. Dickinson, trustee for the Municipal Gas Company, Bankrupt, a covenant to purchase and pay for a minimum of fifteen million cubic feet per month at the rate of fifteen cents per thousand cubic feet, equalling $2,250.00 per month. Accordingly, on or about February 14, 1936, pursuant to the provisions of said fraudulent contract between said fictitious corporation, Oklahoma Petroleum Products Company, and W. D. Dickinson, trustee for the Municipal Gas Company, said M. B. Morgan and S. R. Morgan, acting together, procured from said W. D. Dickinson, trustee for Municipal Gas Company, Bankrupt, the sum of $1,000.00 in compromise and satisfaction of their fraudulent demand for $2,250.00 for the month of January, 1936, under said covenant, which sum was by S. R. Morgan and M. B. Morgan converted to their own use and benefit.

"(4) On or about March 12, 1936, the said S. R. Morgan and M. B. Morgan, acting together through said fictitious corporation and in pursuance of said fraudulent contract, procured from said W. D. Dickinson, trustee for the Municipal Gas Company, Bankrupt, the sum of $2,250.00 for the month of February 1936, which said moneys were by said S. R. Morgan and M. B. Morgan converted to their own use and benefit.

"(5) On or about April 10, 1936, the said S. R. Morgan and M. B. Morgan, acting together through said fictitious corporation and in pursuance of said fraudulent contract, procured from said W. D. Dickinson, trustee for the Municipal Gas Company, Bankrupt, the sum of $2,250.00 for the month of March, 1936, which said moneys were by said S. R. Morgan and M. B. Morgan converted to their own use and benefit."

[2] "The said courts shall have power to impose and administer all necessary oaths, and to punish, by fine or imprisonment, at the discretion of the court, contempts of their authority. Such power to punish contempts shall not be construed to extend to any cases except the misbehavior of any person in their presence, or so near thereto as to obstruct the administration of justice, the misbehavior of any of the officers of said courts in their official transactions, and the disobedience or resistance by any such officer, or by any party, juror, witness, or other person to any lawful writ, process, order, rule, decree, or command of the said courts. (R.S. § 725; Mar. 3, 1911, c. 231, § 268, 36 Stat. 1163.)"

der and decorum in their presence, to secure faithfulness on the part of their officers in their official transactions, and to enforce obedience to their lawful orders, judgments, and processes."

It does not appear that the Supreme Court has ever receded from the interpretation of the act so announced in 1873. Bearing it in mind, we turn to the information herein and we find therein no charge against appellants that they obstructed the administration of justice, or that they misbehaved as officers of the court in any official transactions. Neither is there any charge that they disobeyed or resisted any particular lawful writ, process, order, rule, decree, or command of said court set out or referred to in the information.

■ The gist of the accusation contained in the information was stated by the trial court in its instructions to the jury as follows: "Unless you are convinced from all the testimony in this case adduced, and beyond a reasonable doubt, that the defendants wrongfully, knowingly, intentionally and fraudulently made material misrepresentations to W. D. Dickinson, Trustee in Bankruptcy, with reference to the making of the contracts between him and the Oklahoma Petroleum Products Company, and the Pure Oil Company and the Oklahoma Petroleum Products Company, or concealed material facts in respect to the making of these contracts and the terms set out in said contracts, and that W. D. Dickinson, Trustee, relied upon said fraudulent, material misrepresentations and concealments, and that the said Dickinson, Trustee, was mislead and deceived thereby and that, as a result of said misrepresentations and concealments the bankrupt estates were depleted of a sum of money belonging to said bankrupt estates under the control of W. D. Dickinson, Trustee, then your verdict will be for the defendants, but if you find that said fraudulent, material misrepresentations and concealments were made and as a result thereof said estates were depleted of the said ten thousand dollars, or any part thereof, and the defendants, one or both of them, obtained said money, then you will find for the government."

In the light of this instruction, the verdict of the jury is a finding that the appellants did wrongfully procure the trustee in bankruptcy to pay out the money of the estate by means of deceit and false representations made to the trustee and the referee. The appeal, therefore, presents the question whether such acts are within the contempt statute as interpreted by the Supreme Court. In support of their contention that they are not, the appellants rely strongly upon the decision of the Circuit Court of Appeals in the Second Circuit, in Re Probst, 205 F. 512, 513, where it appeared that the bankrupt had appropriated a part of the bankrupt estate and converted it to his own use and spent it for living expenses. The court said:

"Generally speaking the misappropriation and dissipation by the bankrupt of funds in custody of the court which he has promised to hold subject to its order might fairly be considered a contempt of court. The difficulty here, however, is that the power of the federal District Courts to punish contempts has been so circumscribed by Congress that it can be exercised only in the cases enumerated in section 725, Rev.Stat.U.S.(U.S.Comp.St.1901, p. 583). These cases are:

" 'Misbehavior of any person in their presence, or so near thereto as to obstruct the administration of justice, the misbehavior of any of the officers of said courts in their official transactions, and the disobedience or resistance by any such officer, or by any party, juror, witness, or other person, to any lawful writ, process, order, rule, decree, or command of the said courts.'

"It seems to us that the bankrupt's misappropriation of the money in his hands is not within the first of these clauses, 'misbehavior in the presence of the court, or so near thereto as to obstruct the administration of justice.' He is not an 'officer of the court' who has misbehaved in his official transactions. Our attention has been called to no writ, process, order, rule, decree, or command of the court which he has disobeyed. Had an order been made directing him to pay the amount of the misappropriated money into the registry of the court, and he had disobeyed such order, he would be within the provisions of the section; but on the record presented here we cannot find authority for the entry of the order sought to be reviewed. This may be a highly technical ruling; but where Congress has been so industrious to restrict the natural inherent powers of a federal court, scrupulous attention to the limitations it has imposed would seem to be the proper course."

That we are in accord with the quoted declaration of the court, as to our duty to pay scrupulous attention to the limitation imposed by Congress upon the power of the court to punish for contempt, appears from the following expression of this court in Wilson v. United States, 8 Cir., 26 F.2d 215, 218: "Section 385 is a limitation on the power of the inferior federal courts to punish for contempt, Ex parte Robinson, 19 Wall. 505, 22 L.Ed. 205; and the power must be exercised within the restrictions therein named."

The prosecution here has relied very largely upon the opinion of this court in Clay v. Waters, 8 Cir., 178 F. 385, 395, 21 Ann.Cas. 897. In that case the accused acted in collusion with the bankrupt to prevent a large sum of the bankrupt's money from getting into the hands of the trustee in bankruptcy, and withdrew the money and its proceeds beyond the jurisdiction of the bankruptcy court. This court sustained the order made by the trial court finding the accused guilty of contempt and that he be imprisoned for a certain period, or until he made restitution. The court decided that the acts of the accused constituted a violation of the order and command of the bankrupt court which is embodied by law in the adjudication in bankruptcy. The court said, among other things: "The seizure of the money of the bankrupt after the adjudication and its concealment by the defendant in his name in real estate and promissory notes and his transfer of this real and personal property to innocent third parties to withdraw it from the jurisdiction of the court below and to defeat its coming decree after he was notified by the commencement of the suit to turn it over to the trustee were repeated disobediences and resistances of the injunction and command of the court, and constituted contempts of that court well within the terms of section 725, Rev.St."

But we are not persuaded that the doctrine of Clay v. Waters ought to be extended to the facts presented by the information in this case. These appellants did not seize the bankrupt estate or prevent the trustee from taking possession and control of it, in obedience to the order of adjudication in bankruptcy, as was done by the accused in the Clay Case. These appellants recognized the right of the trustee and his possession and control of the property pursuant to the order of adjudication, and they dealt with him as the officer of the

court, and the rightful custodian of the bankrupt estate. But they practiced a deception and fraud upon the trustee in the course of the business which the trustee was carrying on. Their offense was against the peace and dignity of the government rather than disobedience to the particular injunction and command of the order of adjudication in bankruptcy. See In re Payman, D.C.N.Y., 36 F.2d 823; Wilson v. U. S., 8 Cir., 26 F.2d 215, 218; U. S. v. Mathews, D.C.N.Y., 1 F.Supp. 562, 563. No other order of the bankruptcy court concerning the control, conduct, or operation of the bankrupt properties is alleged to have been contravened by appellants. As it appeared that the appellants were bankrupt, it was, perhaps, considered useless to obtain orders or pursue other remedies against them. But we are not convinced that the acts alleged against them constituted disobedience to any lawful order of the court, and the judgment is therefore reversed.