## UNITED STATES v. HALL.

### No. 230, Docket 22315.

United States Court of Appeals Second Circuit.

Argued April 8, 1952.

Decided Aug. 28, 1952.

Harry Sacher, New York City (David M. Freedman, New York City, on the brief), for appellant.

Roy M. Cohn, Asst. U. S. Atty., New York City (Myles J. Lane, U. S. Atty., and James B. Kilsheimer, III, and Albert A. Blinder, Asst. U. S. Attys., all of New York City, on the brief), for appellee.

Before CHASE, BIGGS, and CLARK, Circuit Judges.

CLARK, Circuit Judge.

Respondent-appellant was convicted in the court below of conspiring to teach and advocate the overthrow of the government by force and violence, 18 U.S.C.A. § 2385, and, pending appeal from his conviction, was ordered released on bail by this court on November 3, 1949. On June 4, 1951, the Supreme Court affirmed his conviction, Dennis v. United States, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137; and a proposed order on mandate requiring his appearance for surrender to the United States Marshal on July 2 was served upon counsel on June 28. Respondent did not appear on July 2, and attempts thereafter to execute a bench warrant at his stated address failed. He was apprehended on October 10, 1951, in Laredo, Texas.

The present proceeding was then commenced against him by affidavit and order to show cause served November 1, 1951.

The charges specified criminal contempt of court in his being without the jurisdictions permitted in orders of Judge Bondy, dated November 10, 1949, and Judge Ryan, dated April 2, 1951, and in failing to surrender on July 2, 1951, as ordered by Judge Ryan on that date. Respondent was arraigned and pleaded not guilty, and the issues were tried without jury pursuant to Fed.Rules Crim.Proc., rule 42, 18 U.S.C.A. The district court dismissed the second count, but held respondent guilty on the first and third counts and sentenced him to three years' imprisonment on each count, the terms to run concurrently. D.C.S.D. N.Y., 101 F.Supp. 666.

The power of the district courts and the courts of appeals to punish for contempt is stated in 18 U.S.C.A. § 401. Specifically such power may be exercised, at the court's discretion, to punish "such contempt of its authority" as "Disobedience or resistance to its lawful writ, process, order, rule, decree, or command." 18 U.S.C.A. § 401(3). See also 18 U.S.C.A. §§ 402, 3691. Respondent seeks, however, by an able and industrious appeal to historical authority, to interpolate by tradition an exception for disobedience to orders to reappear for sentence directed to one convicted for a crime and enlarged on bail pending appeal.

We may agree that the common law did not consider an absconding defendant in contempt of court. It appears that such penalty as was imposed stemmed from the doctrine of outlawry which, on defendant's failure to appear at the fifth proclamation —*quinto exactus*—in successive county courts, 4 Bl.Comm. 283, effected a forfeiture of all goods and chattels. The process was equally available in both civil and criminal proceedings. 4 Bl.Comm. 319. Apparently outlawry was imported into our criminal law with some early vigor,[1] but during the nineteenth century was either abolished

---

1. Respublica v. Doan, Pa.Sup.Ct.1784, 1 Dall. 86, 1 U.S. 86, 1 L.Ed. 47, and see also Additional Appendix, Proceedings of the Supreme Executive Council of Pennsylvania, 1 L.Ed. 240, which speaks of outlawry as "those vindictive supplements to a severe code of jurisprudence"; Respublica v. Steele, Pa.Sup.Ct.1785, 2

Dall. 92, 2 U.S. 92, 1 L.Ed. 303; Commonwealth v. Hale, 2 Va.Cas. 241, 4 Va. 241; Commonwealth v. Hagerman, 2 Va.Cas. 244, 4 Va. 244; Commonwealth v. Anderson, 2 Va.Cas. 245, 4 Va. 245; Dale County v. Gunter, 46 Ala. 118, 138–140.

or fell into disuse.[2] It was unknown on the civil side of the court,[3] and of course today has only an historical interest.

Whatever, then, may have been the common-law punishment for bail jumping, respondent here stands convicted of willful disobedience of certain specific orders made by the district court. We need not now enter into a discussion of the source of the federal contempt power;[4] it is sufficient that the statute defines the acts toward which it may be directed.[5] And since the offense charged falls clearly within the prescribed classes the only question that can arise is whether or not an exception is to be carved out, by an appeal to historical practices, for orders relating to personal surrender for sentence following enlargement on bail. We think not; the written provision itself contains no such exception and we know of no case qualifying its general description of offenses. See Fletcher v. United States, 4 Cir., 174 F.2d 373, 376, certiorari denied 338 U.S. 851, 70 S.Ct. 82, 94 L.Ed. 521. Not long ago we refused to hold that the possibility of accusation and prosecution under a statute defining a crime offered or suggested "any immunity for violating the direct mandate of a court," for "two different powers are involved, though the acts and events may be the same or interwoven." United States v. Field, 2 Cir., 193 F.2d 92, 95, 96, certiorari denied 342 U.S. 894, 72 S.Ct. 202. To similar effect are 18 U.S.C.A. §§ 402 and 3691. We think it would be equally hampering to the authority and dignity of a federal court, thus supported by congressional authority, to read into the broad statutory grant an unexpressed limitation of the form here suggested.

We turn then to the specific counts. The first alleges a violation of Judge Bondy's order of November 10, 1949. This court, on November 2, 1949, had ordered the respondent's release from custody pending appeal upon the posting of a bond in the amount of $20,000. The bond was filed the next day and, in addition to the usual provisions for appearance and surrender for execution of sentence when required, was specifically conditioned that Hall "shall not depart the jurisdiction of the District Court of the United States for the Southern District of New York without leave." Shortly thereafter respondent applied to Judge Bondy for permission to depart the jurisdiction in

---

2. See N.Y.Rev.Stat., Pt. IV, c. II, Tit. 7, § 20, p. 745, abolishing outlawry in New York save on indictment or conviction for treason, N. Y. Code of Criminal Procedure, §§ 814–825.

3. Hall v. Lanning, 91 U.S. 160, 166, 23 L. Ed. 271; Magruder and Foster, Jurisdiction over Partnerships, 37 Harv.L.Rev. 793, 799.

4. Generally labeled "inherent," see inter alia United States v. Hudson, 7 Cranch 32, 11 U.S. 32, 3 L.Ed. 259; Michaelson v. U. S., ex rel. Chicago, St. Paul, Minneapolis & Omaha Ry. Co., 266 U.S. 42, 45 S.Ct. 18, 69 L.Ed. 162; United States v. Landes, 2 Cir., 97 F.2d 378; Fisher v. Pace, 336 U.S. 155, 69 S.Ct. 425, 93 L.Ed. 569. The recent denomination of 18 U.S.C.A. § 401 as "the statute which confers power on a federal court to punish for contempt," Sacher v. United States, 343 U.S. 1, 6, 72 S.Ct. 451, 453, is perhaps a new turn in interpretative theory.

5. "The moment the courts of the United States were called into existence and invested with jurisdiction over any subject, they became possessed of this power. But the power has been limited and defined by the act of Congress of March 2d, 1831. The act, in terms, applies to all courts; whether it can be held to limit the authority of the Supreme Court, which derives its existence and powers from the Constitution, may perhaps be a matter of doubt. But that it applies to the Circuit and District Courts there can be no question. These courts were created by act of Congress. Their powers and duties depend upon the act calling them into existence, or subsequent acts extending or limiting their jurisdiction. The act of 1831 is, therefore, to them the law specifying the cases in which summary punishment for contempts may be inflicted." Ex parte Robinson, 19 Wall. 505, 510, 86 U.S. 505, 22 L.Ed. 205. See also Morgan v. United States, 8 Cir., 95 F.2d 830; Berry v. Midtown Service Corp., 2 Cir., 104 F.2d 107, 122 A.L.R. 1341, certiorari dismissed 308 U.S. 629, 60 S.Ct. 297, 84 L.Ed. 525; In re Gottman, 2 Cir., 118 F.2d 425; Frankfurter and Landis, Power of Congress over Procedure in Criminal Contempts in "Inferior" Federal Courts—A Study in Separation of Powers, 37 Harv.L.Rev. 1010.

order to "take care of his affairs" at his home in the Northern District of Ohio, which was granted in an order quoted in pertinent parts in the footnote.[6] As will be noted, this order recites the just-quoted condition of the bond and then, after granting the requested permission, subject to specified conditions (including return when ordered), provides that for any violation of the conditions the respondent's bond shall be forfeited.

■ The court below read the order as incorporating the promises of the bond, including those to surrender for execution and not to depart the jurisdictions. We think this error, for we find no plain violation, considering the purposes for which the former was drawn, Terminal Railroad Association of St. Louis v. United States, 266 U.S. 17, 29, 45 S.Ct. 5, 69 L.Ed. 150; and of course no contempt attaches merely to a failure to satisfy the guaranties of reappearance in the bond. A fair reading of the order discloses that it was directed to the enlargement of the respondent. The subordinate clauses which follow this directive are to be interpreted merely as setting out the purposes for which this enlargement was permitted—such as Hall's journey to

Cleveland—and its subsequent conditions, including the required approval of his surety. Moreover, the order plainly specifies its own sanction, namely, forfeiture of the bond. In view of this, to construe it as a direct mandate to return on penalty of conviction for contempt requires some little adjustment of phraseology which, to support a conviction of contempt, we think improper.

■ But the order of Judge Ryan of July 2, 1951, is not so equivocal; it required "that the defendants personally surrender to the United States Marshal for the Southern District of New York," and the only question can be as to the sufficiency of the evidence supporting a finding that the defendant knowingly disobeyed. Under 18 U.S.C.A. § 401(3), there must be proof of the contemnor's knowledge of the order, Kelton v. United States, 3 Cir., 294 F. 491, certiorari denied 264 U.S. 590, 44 S.Ct. 403, 68 L.Ed. 864; and the burden on the Government is a high one. Gompers v. Bucks Stove & Range Co., 221 U.S. 418, 444, 31 S.Ct. 492, 55 L.Ed. 797; United States v. Dachis, D.C.S.D.N.Y., 36 F.2d 601; United States v. Univis Lens Co., D.C.S.D.N.Y., 88 F.Supp. 809.

6. "It appearing that Gus Hall, Carl Winter, Gilbert Green, Robert G. Thompson and John Gates are defendants-appellants in the above entitled case and presently under bond in the sum of $20,000.00 each pending appeal from their convictions, which bond inter alia is conditioned upon each of said defendants-appellants remaining within the jurisdiction of the Southern District of New York, and it further appearing that each of said defendants-appellants resides outside the Southern District of New York and is desirous of returning to the Federal District in which his home is located * * * to be with his family and to take care of his affairs, it is hereby

"Ordered that each of said defendants-appellants, Gus Hall, Carl Winter, Gilbert Green, Robert G. Thompson and John Gates is hereby given permission to depart from the Southern District of New York upon the following express conditions and subject in all other respects to the conditions of the bonds aforesaid: That he may depart from the Southern District of New York and go to the Federal District in which his home is located to be with his family and attend to his affairs temporarily; that he will return to the Southern District of New York whenever ordered by this Court so to do; that in case he removes from his present home or changes his address, he shall forthwith inform the United States Attorney for the Southern District of New York to that effect; that Robert W. Dunn, who executed the bail bond for each of the defendants-appellants hereinabove named, shall give his written consent to the making and entry of this order; and that Robert W. Dunn, Frederick V. Field, Dashiell Hammett, W. Alphaeus Hunton and Abner Green, Trustees of the Bail Fund of the Civil Rights Congress of New York, shall give their written consent to the making and entry of this order, and it is further

"Ordered that for any violation of any of the conditions hereinabove named by any of said defendants-appellants the bond of such defendant-appellant shall be forfeited."

■ The evidence adduced showed the following: Upon the Supreme Court's affirmance of the conviction, a proposed order on mandate requiring surrender on July 2, 1951, at a specific time was served on Mr. Sacher, an attorney in the case, on June 28, 1951. The next day Mr. Sacher appeared before Judge Ryan in support of applications for orders to show cause why the sentences should not be reduced or, as to one of the defendants, suspended because of illness. Judge Ryan agreed to hear the applications on July 2, and Mr. Sacher stated: "You have my word that all of these defendants will be here at that .time." By July 3, however, four had failed to appear and, upon Judge Ryan's inquiry as to where he last saw these four, Mr. Sacher stated that he had seen them on Friday (June 29) at 35 East 12th Street. The court inquired: "Did you tell them at that time that their presence was required in court yesterday morning?" Mr. Sacher replied: "Definitely. As a matter of fact I advised that because I think I saw them among other defendants after I had been here on Friday, your Honor, and had made these motions, and therefore advised that they all should be present, and I was assured that they would be."

There was further evidence, given by a person present, of a banquet in respondent's honor at Cleveland on June 24, 1951, where the remarks of respondent, as well as other speakers, showed full awareness that he was about to be imprisoned to serve his federal sentence. So early in the morning of June 30 he was observed to leave his New York apartment, carrying two suit cases and some suits on a hanger to an automobile, and to drive away. He then had light hair and a mustache, and was heavier in weight than at his trial. When he was apprehended three months later on the Mexican border his hair was dyed dark brown, his mustache had been removed and he weighed twenty pounds less. He did not take the stand.

Hence from the uncontroverted evidence it appeared that there was a specific order for his appearance, that this was directly communicated to him, and that he willfully and intentionally absconded two days before his ordered appearance. The only possible gap in the proof is the lack of complete and direct showing of his awareness of the purpose for which his court attendance was required. In vigorous and able argument, his counsel makes much of this and suggests in fact that counsel's own explanation to the court indicates that he was told to be present to hear the arguments on the motions. The statement quoted above —"and *therefore* advised that they all should be present"—is at best equivocal, but we need not look to this alone. Respondent, with a considerable legal sophistication born of long involvement, could hardly have arrived at the bizarre conclusion (under the circumstances) that he was wanted then only to hear lawyers' talk; and his actions in furtively absconding show rather decisively that he was under no illusions as to his situation.

On this record, therefore, we think the court was eminently justified in finding as a fact that respondent had complete notice of the order and willfully disobeyed it.[7] The inference not only was well within the area permitted to a trier of facts, but was indeed one highly reasonable if not compelled. However heavy the evidential burden on the prosecution here, it can hardly be held more exacting than the "proof beyond a reasonable doubt" of an ordinary criminal case before a jury. We have been often pressed, but have consistently refused, to apply this formula to each link in the chain of alleged events in order that if as to any the proof is not thus overwhelming there must be a reversal of a verdict of guilt. Instead we have said that the process of drawing inferences is to be governed, as ordinarily, by human experience, that indeed no other rule of jury fact finding has a claim to reality, and that the strict re-

7. That this was a notice to appear for the order of commitment, rather than that order itself, raises no question; the notice, too, formed part of the court's command. See Pettibone v. United States, 148 U.S. 197, 206, 13 S.Ct. 542, 37 L.Ed. 419.

quirement as to burden of proof constitutes an over-all admonition or warning, rather than a precise yardstick to be applied to each isolable segment of the proof. United States v. Valenti, 2 Cir., 134 F.2d 362, 364, certiorari denied Valenti v. United States, 319 U.S. 761, 63 S.Ct. 1317, 87 L.Ed. 1712; Gariepy v. United States, 6 Cir., 189 F.2d 459, 462; United States v. Sherman, 2 Cir., 171 F.2d 619, 621; United States v. Spagnuolo, 2 Cir., 168 F.2d 768 and cases cited 770, certiorari denied Spagnuolo v. United States, 335 U.S. 824, 69 S.Ct. 48, 93 L.Ed. 378. There can be little doubt but that a jury would have been permitted to make the rational inference made below. We think that a court must not be restricted beyond a jury or compelled to remain blind to so clearly intentional a flouting of its command as was here shown.

We therefore reverse the finding of contempt of Judge Bondy's order of November 10, 1949, and affirm the finding of contempt of Judge Ryan's order of July 2, 1951. Though the conviction necessarily is affirmed, since the sentences are to run concurrently, we have examined both issues for error against the event that respondent might apply to the district court's discretion for a reduction of sentence under F.R.Cr. P., rule 35. See United States v. Field, 2 Cir., 193 F.2d 92, 97, and cases cited therein, certiorari denied Hammett v. United States, 342 U.S. 894, 72 S.Ct. 202.

Reversed as to the first count; affirmed as to the second count.

BIGGS, Circuit Judge (concurring in part and dissenting in part).

I concur in the majority opinion in all respects save one. I cannot agree that a conviction for criminal contempt may be sustained on facts from which it is shown that the United States Attorney had given notice to an attorney of a *proposed* order requiring his client to appear for execution of sentence, even though the inference is

properly supportable that the attorney informed his client of the proposed order. The pertinent statute is Section 401(3), Title 18, U.S.C.[1]

On June 28, 1951, the mandate of the Supreme Court in Dennis v. United States, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137, was about to be handed down, and Hall was on bail as one of the defendants-appellants whose judgment of conviction had been affirmed by the Supreme Court in the Dennis case. The United States Attorney that day caused to be served on most of the attorneys for the defendants-appellants in Dennis a "Notice of Settlement" to the effect that an "Order on Mandate" would be presented for signature by the court on the morning of July 2, 1951.

The proposed order contained the following unusual provision: " * * * and it is further ordered, adjudged and decreed that the defendants [including Hall] personally surrender to the United States Marshal for the Southern District of New York in Room 318, United States Court House, Foley Square, New York, N. Y., on the —— day of July, 1951, at 10:30 o'clock in the forenoon on that day."

Hall was represented of record in the Dennis proceeding by Attorney Gladstein but Attorney Sacher, who was counsel of record for other defendants therein, accepted service of the proposed order on behalf of Hall by signing the "Admission of Service" by "Richard Gladstein by HS."

On June 29, 1951, the United States Attorney and Mr. Sacher appeared in open court before Judge Ryan. Mr. Sacher had an application which he desired to make respecting the sentences of all the defendants-appellants in the Dennis case and another application going particularly to the sentence of the defendant-appellant Stachel and he desired to obtain rules to show cause on both applications. The United States Attorney wished to have Judge Ryan sign the "Order on Mandate" containing the

---

1. Section 401 is as follows:
   "A court of the United States shall have power to punish by fine or imprisonment, at its discretion, such contempt of its authority, and none other, as—
   * * * * *

"(3) Disobedience or resistance to its lawful writ, process, order, rule, decree, or command."
See also the original Act of September 24, 1789, 1 Stat. 83 and the Act of March 2, 1831, 4 Stat. 487–488.

provision quoted above. Judge Ryan refused to make any orders in Dennis because he was of the opinion that he did not possess the power to enter any order therein until the mandate of the Supreme Court had been received by the United States District Court for the Southern District of New York.

It was anticipated that the mandate would be received by Monday, July 2.[2] The court said among other things, "We will pass on everything at that time." Counsel indicated that this would be satisfactory. Judge Ryan then stated: "All right. I won't sign these orders but it is understood that these applications will be heard on Monday."

It was stipulated by the United States Attorney and by Mr. Sacher at the hearing on the contempt proceeding on November 21, 1951, that he had seen Hall "* * * sometime on Friday [June 29] at 35 East 12th Street in New York City." Mr. Sacher stipulated also that on Friday, June 29, he had informed Hall that his presence would be required in court on July 2. It was agreed at the hearing of November 21 that at a hearing on July 3 before Judge Ryan, the court asked Mr. Sacher, "Did you tell them at that time [June 29] that their [Hall's] presence was required in court yesterday morning [July 2]?" Mr. Sacher replied, "Definitely. As a matter of fact I advised that because I think I saw them among the other defendants after I had been here on Friday [June 29], your Honor, and had made these motions, and therefore advised

that they all should be and I was assured that they * * * [would] be [in court on July 2]." This was the extent of Mr. Sacher's admission by stipulation. He was not sworn nor did he give any evidence at this or any prior or subsequent hearing.[3]

Early on the morning of June 30 Hall absconded, being apprehended at Laredo, Texas, some months later. On July 2 at 11:05 A. M. Judge Ryan signed the order of which Hall has been adjudged to stand in contempt. On July 2 the figures and letters "2nd" were inserted in the blank before the word "day" preceding the phrase "of July, 1951" in the face of the paragraph heretofore quoted and the figures "10:30" were stricken out before the word "o'clock" and there was inserted therein the figures "11:-05." Judge Ryan then signed the order. It then read as to the particular paragraph with which we are concerned as follows: "* * * and it is further ordered, adjudged and decreed that the defendants [including Hall] personally surrender to the United States Marshal for the Southern District of New York in Room 318, United States Court House, Foley Square, New York, N. Y., on the 2nd day of July, 1951, at 11:05 o'clock on the forenoon of that day." The order was of course not served on Hall. There is no evidence that he had actual notice or knowledge that the proposed order was ever signed until the contempt specifications were served on him.

The "Specifications of Criminal Contempt," under which Hall has been found guilty (Paragraph "B" thereof), state:

2. The following colloquy took place on June 29, 1951, between the court and counsel respecting all the motions:
"Mr. Sacher: Mr. Saypol has told you, I think, that he has served an order returnable Monday morning at 10 o'clock to make the mandate of the Supreme Court the order of this Court.
"May I ask your Honor to be good enough to withhold the signing of that order until you have heard our arguments on Monday?
"The Court: Yes, the matters will all come up on Monday at the same time as these two applications.
"Mr. Sacher: You have my word that all of these defendants will be here at that time.

"The Court: We will pass on everything at that time.
"Mr. Sacher: Good enough.
"Mr. Saypol: Satisfactory.
"The Court: All right. I won't sign these orders, but it is understood that these applications will be heard on Monday.
"Mr. Sacher: Very good. Thank you."
See the transcript of June 29, 1951, filed September 28, 1951.

3. Mr. Sacher stated later, during the course of the contempt proceeding, that he had not informed Hall of the order of July 2. The statement, however, does not constitute evidence for Mr. Sacher was not under oath when he made it.

"The contemnor disobeyed and resisted the * * * [order of July 2] by failing to surrender on said date or at any other time prior to his apprehension at Laredo, Texas, on October 10, 1951." The supporting affidavit of the United States Attorney alleges: "Upon information and belief, respondent Hall well *knew*[4] of the outstanding orders and decrees of this court, and was in wilful and deliberate disobedience and resistance to said orders and decrees of this court * * * and was therefore in criminal contempt of this court and of its authority." A rule was entered on the specifications and the affidavit, and the instant proceedings were commenced. Hall's answer therefore, was not and could not have been treated as evidence of his knowledge of the signed order of July 2, for he was charged with contempt prior to the filing of his answer.

The question posed is a narrow one and may be restated as follows: Conceding, as it must be, that Hall knew on June 29 that an order requiring him to appear on July 2 for execution of his sentence might be made by Judge Ryan on July 2, is this knowledge sufficient to sustain his conviction of contempt of the order of July 2?

Despite Hall's contentions to the contrary I entertain no doubt but that the order of July 2 was a valid one when entered. But on June 29 no valid order requiring Hall to appear on July 2 was in existence: none had been made and, indeed, the court below was technically without the power to enter any order in the Dennis case for the Supreme Court's mandate had not been received. If Hall is to be held to answer for contempt of the July 2 order, (1) facts must be shown from which the court below was entitled to infer that Hall knew the order of July 2 had been entered, or (2) Hall must be held responsible on an application of a theory of constructive notice.

As to (1) supra, there is no evidence in the record from which the court below could have inferred that Hall knew that the order of July 2 had been entered.

As to (2) supra, can the theory of constructive notice be properly applied under the circumstances of this criminal case? It is true that the doctrine of constructive notice as distinguished from actual notice or knowledge is frequently applied in civil injunction, or other civil, proceedings. A party to a civil suit, civil injunction proceedings in particular, is on notice as to any future order which the court may enter in his case. As an extreme illustration, if a complaint to enjoin waste has been filed and the court has jurisdiction of the cause of action and of the defendant and if prior to a decree or judgment against him the defendant cuts the woods or lays waste the farmland, he does so at his peril and may be held in contempt of a valid decree entered by the court. In New York, under the Civil Practice Act, Section 882, as amended by Laws 1930, c. 378, any notice which the court deems sufficient to apprise a defendant of an application for a temporary injunction is deemed sufficient to render the defendant chargeable with a breach of the injunction when entered. See George F. Stuhmer & Co. v. Korman, 143 Misc. 246, 256 N.Y.S. 253. See also 2 Daniels, Chancery Practice, 6th Am. ed. 1684, 2 High, Injunctions, 4th ed. Sections 1420 and 1452.

Constructive notice is notice which is implied by law. Prouty v. Devin, 118 Cal. 258, 50 P. 380. Constructive notice assumes that no information concerning the prior fact has been directly and personally communicated to the party but is inferred by operation of legal presumption. See 2 Pomeroy, Equity Jurisprudence, Section 593, 5th ed. 1941. Nonetheless, constructive notice is held to be sufficient by the great weight of authority in civil suits. But no case has been cited to us and I have found none where the doctrine of constructive notice has been applied in a criminal case including a criminal contempt proceeding. Though the United States places great reliance on the decision in Pettibone v. United States, 148 U.S. 197, 13 S.Ct. 542, 37 L.Ed. 419, the Pettibone decision does not support the Government's position for it is too far removed in its facts from the instant case.[5] Indeed in the Pettibone case

---

4. Emphasis added.

5. In the Pettibone case the defendants were indicted under R.S. §§ 5399 and 5440, 18 U.S.C.A. §§ 371, 1503, for cor-

the opinion strongly indicates, albeit by way of dicta, that *scienter*, viz., knowledge of the existence of a fact which is an essential element of the crime, must be alleged and proved. In the instant case an essential element of the crime was knowledge on the part of Hall that the order of July 2 had been entered.

In United States v. Day, 25 Fed.Cas. pp. 793, 795, No. 14,934, reference is made to the curtailment of the inherent contempt power of federal courts by the act of March 2, 1831, 4 Stat. 487. The Master in the Day case stated that this statute " * * * was beyond doubt intended as a guide for the courts, and to forbid in future all constructive contempts", and for an act to constitute a contempt, " * * * there must be a decree or order in existence, and a disobedience or resistance to such decree or order." Cf. In re Sixth & Wisconsin Tower, 7 Cir., 108 F.2d 538. The Day decision is one dealing with constructive contempt rather than constructive notice. That the Supreme Court has drastically curtailed the operation of the theory of constructive contempt has been so recently demonstrated as to require no extended discussion. See Matter of Michael, 326 U.S. 224, 227, 66 S.Ct. 78, 90 L.Ed. 30, and Nye v. United States, 313 U.S. 33, 61 S.Ct. 810, 85 L.Ed. 1172, overruling Toledo Newspaper Co. v. United States, 247 U.S. 402, 38 S.Ct. 560, 62 L.Ed. 1186. Hall's counsel contends that in the whole course of our law as well as that of England there has been no proceeding like the one at bar. The view asserted may be an exaggerated one but exhaustive independent research has disclosed no similar case. It is probably the first time that a proceeding like this has been before the courts.

Hall was charged with a crime, a criminal contempt. See In re Fox, 3 Cir., 96 F.2d 23, 25. To base a conviction for criminal contempt upon *constructive* notice is too close to basing a conviction on *constructive* contempt. But the question presented in the instant case is really one of due process. Proof of actual notice or knowledge on Hall's part that the order of July 2 had been entered is a constitutional requirement under all the circumstances. Moreover, the United States Attorney did not base his charge on constructive notice but on actual knowledge. He alleged that Hall "well knew" of the order of July 2.

It may be asserted that this view bestows a benefit on the convicted defendant who, when his appeal has failed, does not sur-

---

ruptly conspiring to interrupt the course of justice in a United States Court. The United States Circuit Court for the District of Ohio had issued an injunction in a labor dispute to restrain the defendants from attempting to prevent by any force or intimidation any employee of certain mining companies from going to work. The Supreme Court quashed the indictment because it did not allege that the purpose of the conspiracy was to obstruct the administration of justice by the court issuing the injunction or to violate the injunction.

Mr. Chief Justice Fuller laid emphasis on the fact that it was necessary for the defendants "* * * to have [had] knowledge or notice or information of the pendency of proceedings in the United States court * * *." See for example, 148 U.S. at pp. 205, 206 and 207, 13 S.Ct. 542, 546. Referring to Savin, Petitioner, 131 U.S. 267, 9 S.Ct. 699, 33 L.Ed. 150, Mr. Chief Justice Fuller stated: "In matters of contempt, persons are not held liable for the breach of a restraining order or injunction unless they know or have notice, or are chargeable with knowledge or notice, that the writ has been issued or the order entered, or at least that application is to be made; but without service of process, or knowledge or notice or information of the pendency of proceedings, a violation cannot be made out." See 148 U.S. at pp. 206–207, 13 S.Ct. 542, 546, citing *inter alia*, 2 High, Injunctions, 3rd ed., Sections 1421 and 1452. But in the Pettibone decision it is pointed out that whenever knowledge is an essential ingredient of the offense and not implied by a mere statement of the prohibited act itself *scienter* is a necessary element, one which must be alleged and proved.

The words quoted above from Mr. Chief Justice Fuller's opinion were employed by him by way of an analogy between the facts of contempt proceedings and those of the cited case. Knowledge of the defendants of the injunction issued by the United States Court for the District of Ohio was deemed an essential element of the crime, an operative fact which had to be both alleged and proved.

render himself for execution of his sentence but absconds. A question of great public policy is here involved, however. The constitutional question aside, can it be said that Congress in enacting Section 401, Title 18, U.S.C. intended its provisions to have the United States courts base convictions for criminal contempt on orders not yet entered? When the statute speaks of an "order," the reasonable conclusion is that it means an order *in esse*.

It is suggested, however tacitly, in the brief of the United States and it was argued before this court, that, by reason of the colloquy during the hearing of June 29, 1951 (set out in pertinent part in note 2, supra) and the stipulation that Mr. Sacher had told Hall to be present in court on July 2 (as he should have been) the court below, prior to July 2, issued a "command," within the purview of 18 U.S.C. Section 401(3), that Hall be in court on July 2; and, since Hall was not in court on July 2 in response to this "command," he was properly adjudged guilty of contempt in the instant proceeding. This view of the case has been adopted by the majority opinion.[6] But this court ruled in Berry v. Midtown Service Corporation, 104 F.2d 107, 110, Judge Clark dissenting, that it had to be shown that " * * * a party must have violated an express court order before he can be punished for contempt under the final clause of Section 385 [of former Title 18]", citing Ex parte Buskirk, 4 Cir., 72 F. 14, Dakota Corp. v. Slope County, 8 Cir., 75 F.2d 584, and Morgan v. United States, 8 Cir., 95 F.2d 830.

Hall was held to answer in the contempt proceeding for violation of the express order of July 2, 1951 entered by Judge Ryan on that day and insofar as the record before us shows, no other "command" was given by the court. This was the consistent attitude of Judge Ryan and of the parties to the contempt proceeding and, veritably, the theory on which the case was tried. See,

for example, Judge Ryan's statements at page 29 of the transcript of the contempt hearings and his opinion. It follows that my difficulty in holding Hall guilty of contempt is not one merely of pleading. The reason that I cannot agree with the majority on this phase of the case lies in the fact that the colloquy quoted in note 2, supra, and the stipulated fact that Hall's counsel had directed him to be in court on July 2, could not support an adjudication of guilt for criminal contempt against Hall even had the case been tried (as it was not) on the theory that Hall was guilty of contempt of a "command" by the court, issued prior to the express order of July 2.

I would reverse Hall's conviction and direct his acquittal of the charge of contempt based on Judge Ryan's order of July 2.

---

6. The statements made by Judge Ryan and Mr. Sacher on July 3, 1951, that Hall's presence in court on July 2 had been "required" at first blush lend color to this view. But, as I have said, Hall's counsel stated, albeit on his word, only

that he would have Hall in court on July 2. Judge Ryan then stated that he would hear the applications, including the proposed order requiring Hall to appear, on July 2.